UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**Judge Berman**

**08 CV 1205**

Case No. _____

| | |
|---|---|
| CANTEEN VENDING COMPANY,<br>**Individually and on behalf of a class of all those<br>similarly situated,** | ) )<br>) )<br>) ) |
| **Plaintiff,** | ) )<br>) ) |
| – *against* – | ) )<br>) ) |
| CADBURY ADAMS CANADA, INC.,<br>CADBURY SCHWEPPES PLC, CADBURY<br>ADAMS USA LLC, HERSHEY CANADA<br>INC., THE HERSHEY COMPANY, MARS<br>CANADA INC., MARS, INC., MARS NORTH<br>AMERICA, MARS SNACKFOOD INC.,<br>NESTLE CANADA INC., NESTLE S.A.,<br>and NESTLE USA, | ) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) ) |
| **Defendants.** | ) )<br>) )<br>) ) |

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**ECF Case**



RECEIVED

FEB 06 2008

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Canteen Vending Company ("Plaintiff"), individually and on behalf of a class of

all those similarly situated, brings this action for treble damages under the antitrust laws of the

United States against Defendants Cadbury Adams USA, LLC, Cadbury Adams Canada, Inc.,

Cadbury Schweppes plc, Hershey Canada Inc., The Hershey Company, Mars Canada Inc., Mars,

Incorporated, Mars Snackfood, Inc., Nestle Canada Inc., Nestle S.A., and Nestle USA

(collectively, "Defendants"), and demands a trial by jury.

## NATURE OF THE ACTION

1.     This action arises out of an international conspiracy among the world's leading

manufacturers of chocolate confectionery products: Cadbury Schweppes plc and its affiliates

("Cadbury"), the Hershey Company and its affiliates ("Hershey"), Mars, Incorporated and its

1

affiliates ("Mars") and Nestle S.A. and its affiliates ("Nestle"). The purpose of this conspiracy was to fix, raise, maintain or stabilize prices for those products in the United States. The conspiracy began in 2002. Prior to this Complaint, U.S. and Canadian competition authorities have announced investigations into price-fixing of chocolate confectionery products.

2.    Plaintiff alleges a conspiracy since January 2002 among Defendants and certain unnamed co-conspirators to fix, raise, maintain, or stabilize prices for chocolate confectionery products sold in or sold for delivery in the United States and its territories. From 1996 to 2002, Defendants made no announcements of wholesale price increases for chocolate confectionery products and in fact North American prices for their chocolate confectionery products were stable or declining. Beginning in 2002, defendants began to communicate about price increases and other pricing practices and as a result, defendants announced new price increases by the end of 2002. From 2002 to 2004, prices for chocolate confectionery products rose an average of 12.8 percent as a result of the price fixing conspiracy. Following 2004, Defendants successfully maintained prices approximately 10 percent above 2002 levels.

3.    Canadian authorities have disclosed affidavits seeking search warrants that conclude that there is reasonable cause to believe that a conspiracy to fix the prices of chocolate confectionery products began in February 2002. This conclusion is based on information from an amnesty applicant, believed to be the Cadbury Defendants, and documents obtained by Canadian competition authorities. In the United States, prior to 2002, prices of Canadian chocolate imported to the U.S. were characterized by price reductions while prices in the United States were characterized by price stability. Beginning at the start of 2002, prices of chocolate confectionery products in both the United States and Canada have been characterized by price increases:



**Chocolate Confectionery Products Index Values**

4.      Plaintiff brings this action on behalf of all persons who purchased chocolate confectionery products (as defined herein) directly from any Defendant at any time from January 1, 2002 through the present (the "Class Period") where such purchase took place either in the United States and its territories or elsewhere for delivery in the United States and its territories. As a result of Defendants' unlawful conduct, Plaintiff and the Class (as defined in this Complaint) paid artificially inflated prices for these products, and therefore have suffered injury to their business and property.

### JURISDICTION AND VENUE

5.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys'

3

fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and the Clayton Act (15 U.S.C. §§ 1, 15(a), 22 and 26).

7.     Venue is proper in this Judicial District pursuant to 15 U.S.C.§§ 15 and 22 and 28 U.S.C § 1391(b) and (c) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

8.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of chocolate confectionery products throughout the United States, including this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

9.     Plaintiff Canteen Vending Company is a Pennsylvania corporation with its principal place of business at 201 Maynard Street, Williamsport, PA 17701.  Plaintiff purchased chocolate confectionery products in the United States or for delivery in the United States directly from one or more of the Defendants during the Class Period.

10.     Defendant Cadbury Schweppes plc ("Cadbury Schweppes") is an English company, and its principal executive offices at 25 Berkeley Square, London, England.  Cadbury

Schweppes' principal businesses are confectionery and non-alcoholic beverages, and it has the largest share of the global confectionery market, with broad participation across all categories and by geography. Cadbury has confectionery operations in the U.S. and Canada. During the Class Period, Cadbury Schweppes licensed The Hershey Company to manufacture and distribute York Peppermint Patties, Peter Paul Mounds, Peter Paul Almond Joy worldwide and Cadbury and Caramello branded products in the United States. Cadbury Schweppes manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

11.    Defendant Cadbury Adams USA LLC ("Cadbury Adams USA") conducts the U.S. operations of Cadbury Schweppes plc, including the manufacture and sale of chocolate confectionery products. Cadbury Adams USA LLC has its principal place of business at 389 Interpace Parkway, Suite 1, Parsippany, New Jersey.

12.    Defendant Cadbury Adams Canada, Inc. ("Cadbury Adams Canada") is a Canadian corporation with its principal place of business at 5000 Yonge Street, Suite 2100, Toronto, Ontario. Cadbury Adams Canada is a subsidiary of defendant Cadbury Schweppes plc. Cadbury Adams Canada manufactures and sells a wide array of confectionery products and exports chocolate confectionery products into the United States. During the Class Period, Cadbury Adams Canada manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

13.    Defendant The Hershey Company is a Delaware corporation with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania. The Hershey Company is the leading North American manufacturer of chocolate and non-chocolate confectionery and grocery products. Hershey manufactures a variety of chocolate confectionery products under the

5

Hershey's, Hershey's Kisses and Reese's brand names. In addition, it manufactures and distributes in the United States certain chocolate confectionery products under license, such as the products mentioned above under a license from Cadbury and the Kit Kat bar under a license from defendant Nestle S.A.  Hershey also manufactures and distributes various other chocolate confectionery products, such as the 5th Avenue bar, the Krackel bar, Milk Duds, the Special Dark bar and the Harmony Bar.  During the Class Period, The Hershey Company manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

14.    Defendant Hershey Canada Inc. ("Hershey Canada") is a Canadian corporation with its principal place of business at Airport Corporate Centre, 5750 Explorer Drive, Mississauga, Ontario.  Hershey Canada is a wholly-owned subsidiary of The Hershey Company that manufactures, distributes, and sells confectionery, snack, refreshment and grocery products in Canada and exports chocolate confectionery products into the United States.  During the Class Period, Hershey Canada manufactured and sold chocolate confectionery products to purchasers in the Canada and the United States, directly or through its predecessors, affiliates and/or subsidiaries.

15.    Defendant Mars, Incorporated is a privately held company based in McLean, Virginia.  During the Class Period, Mars manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

16.    Defendant Mars North America is headquartered at 800 High Street, Hackettstown, New Jersey.  It is the United States food, snack, and pet care operations of defendant Mars, Incorporated.  During the Class Period, Mars North America manufactured and

sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries. Mars manufactures and distributes various chocolate confectionery products such as the 3 Musketeers, Mars, Snickers, Twix, Dove and Milky Way bars.

17.     Defendant Mars Snackfood U.S. is headquartered at 800 High Street, Hackettstown, New Jersey. It is a business unit of defendant Mars, Inc. and is responsible for the manufacture and sale of chocolate and non-chocolate confectionery products across various facilities located throughout the United States, directly or through its predecessors, affiliates and/or subsidiaries.

18.     Defendant Mars Canada Inc. ("Mars Canada") is a Canadian corporation with its principal place of business at 37 Holland Drive, Bolton, Ontario. Mars Canada is the Canadian division of Mars, Incorporated. Before May 8, 2007, Mars Canada was known as Effem Inc. During the Class Period, Mars Canada manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries. Mars Canada manufactures, distributes, and sells confectionery, snack, refreshment and grocery products in Canada and exports chocolate confectionery products into the United States.

19.     Defendant Nestle S.A. is a Swiss company with its principal place of business at Avenue Nestle 5, CH-1800, Vevey, Vaud, Switzerland. It is the world's largest food and beverage company. Nestle S.A. participates in numerous markets, including coffee, water, other beverages, ice cream, infant nutrition, health food, pet food, soups, seasonings, pasta sauces, frozen food, refrigerated products, confectionery, and biscuits. During the Class Period, Nestle

S.A. manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

20.    Defendant Nestle USA is a Delaware corporation with its principal place of business at 800 North Brand Boulevard, Glendale, California. Nestle USA is a wholly-owned subsidiary of Nestle S.A. Nestle USA is grouped into various divisions, including chocolate and confectionery, coffee and beverages, food services, ice cream, nutrition, water, and pet care. During the Class Period, Nestle USA manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

21.    Defendant Nestle Canada Inc. ("Nestle Canada") is a Canadian corporation with its principal place of business at 25 Sheppard Avenue West, Floors 18-22, North York, Ontario. Nestle Canada is a wholly-owned subsidiary of Switzerland's Nestle S.A. Nestle Canada is grouped into various divisions, including chocolate and confectionery, coffee and beverages, food services, ice cream, nutrition, water, and pet care. Nestle Canada manufactures, distributes, and sells confectionery, snack, refreshment and grocery products in Canada and exports chocolate confectionery products into the United States. During the Class Period, Nestle Canada manufactured and sold chocolate confectionery products to purchasers in the United States, directly or through its predecessors, affiliates and/or subsidiaries.

## CO-CONSPIRATORS

22.    Various other persons, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Each defendant acted as the agent or joint venturer of or for other defendants with respect to the acts, violations and common course of conduct alleged by Plaintiff.

8

23.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All persons and entities who purchased chocolate confectionery products directly from any Defendant at any time from January 1, 2002 through the present where such purchase was either in the United States and its territories or for delivery in the United States and its territories (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries and affiliates).

25.     Plaintiff does not know the exact number of class members because such information is in the exclusive control of Defendants.  But due to the nature of the trade and commerce involved, Plaintiff believes that there are hundreds or thousands of Class members as described above, the exact number and their identities being known by Defendants.

26.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

27.     There are questions of law and fact common to the Class, including:

     a.     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices of chocolate confectionery products produced in either the United States or Canada and sold in the United States and its territories or for delivery in the United States and its territories;

b.    The identity of the participants of the conspiracy;

c.    The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether the conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.    Whether the conduct of Defendants and their co-conspirators, as described in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

f.    The effect of the conspiracy on the prices of chocolate confectionery products sold in the United States and its territories or for delivery in the United States and its territories during the Class Period;

g.    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the other members of the Class; and

h.    The appropriate class-wide measure of damages.

28.    Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a direct purchaser of chocolate confectionery products, and its interests are coincident with, and not antagonistic to, those of the other members of the Class.

29.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

30.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

31.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

32.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

33.    Chocolate comprises a number of raw and processed foods that are produced from the seed of the tropical cacao tree. Chocolate is any product made primarily of cocoa solids and cocoa fat. The different flavors of chocolate can be obtained by varying the time and temperature when roasting the beans, by adjusting the relative quantities of the cocoa solids and cocoa fat, and by adding non-chocolate ingredients.

34.    The term "chocolate confectionery products", as used in this Complaint, refers to chocolate bars, boxed chocolates, and seasonal novelty chocolates. Over $10 billion in chocolate confectionery products are sold annually on a wholesale basis in the United States.

35.    Chocolate bars are divided into block and countline segments. The block segment is comprised of molded blocks of chocolate that can be prepared "as is" or with additional ingredients, and are traditionally sold in standard weight and sizes. Products in this segment include Hershey's Chocolate Bar and Cadbury's Dairy Milk bar. The countline segment consists of chocolate-covered products sold by count rather than weight. Examples of products in this segment include Mars' Snickers bar and M&M's and Nestle's Kit Kat bar.

36.    Boxed chocolates are assorted chocolates sold together in a box or similar container, and are mainly sold as gifts. Examples of products in this segment include Cadbury's Milk Tray and Hershey's Pot of Gold.

37.    Seasonal novelty chocolates are chocolates that tend to be sold near, and marketed for, particular holidays, such as Christmas, Easter, Valentine's Day, and Halloween.

38.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce in the United States.

39.    During the Class Period, Defendants and their co-conspirators, manufactured, sold and shipped substantial quantities of chocolate confectionery products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced these products.

40.    The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## FACTUAL ALLEGATIONS

41.    The market for chocolate confectionery products is highly concentrated. Defendants collectively control almost 50% of the global chocolate confectionery products market, with Hershey controlling 8.2%, Nestle 12.6%, Cadbury 7.5%, and Mars 14.8%. Defendants The Hershey Company, Mars, Incorporated, and Nestle USA collectively possess approximately 80% of the U.S. chocolate confectionery products market, with The Hershey Company possessing about 45%, Mars, Incorporated about 27%, and Nestle about 9%. And Defendants Hershey Canada, Mars Canada, Nestle Canada and Cadbury Adams Canada Inc.

collectively possess about 64% of the Canadian chocolate confectionery products market, which includes chocolate confectionery products exported to the United States.

42.     The United States is the leading importer of chocolate confectionery products from Canada as well as the leading exporter of chocolate confectionery products to Canada. A 2004 United States Department of Agriculture report noted that in 2003, 46% of U.S. confectionery exports were to Canada. A 2005 United States Department of Agriculture report noted that "the United States supplied 45% of Canadian chocolate candy imports by value." The 2007 Matrade New York report cited above indicated that in 2004-06, Canada was the largest exporter of chocolate food products to the U.S., with annual total customs values ranging from $690 to $705 million.

43.     From at least January 1, 2002 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of chocolate confectionery products in the United States or for delivery in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

44.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for chocolate confectionery products in the United States or for delivery in the United States.

45.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

        a.    participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain or stabilize prices of chocolate confectionery products in the United States;

b.    issuing price announcements consistent with, and selling chocolate confectionery products at, the agreed upon prices; and

c.    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

46.    The Canadian Competition Bureau currently is investigating Defendants for alleged price-fixing of chocolate confectionery products and recently received permission to search their Canadian offices.  The Competition Bureau submitted two sets of Information on November 19 and November 28, 2007, in support of its request to obtain search warrants stating that there was reasonable cause that Defendants had been engaged in a conspiracy to fix chocolate confectionery products since February 2002.  On November 21, 2007, Ontario's Superior Court of Justice granted those warrants "based on evidence that there are reasonable grounds to believe that a number of suppliers in the chocolate confectionery industry have engaged in activities contrary to the conspiracy provisions of the Competition Act."

47.    According to the Canadian Competition Bureau, the conspiracy—as it applied to Canada—included the following:

a.    The conspiracy arose from communications between employees of the Cooperating Party (believed to be Cadbury Adams Canada), Hershey Canada Inc., Mars Canada Inc., Nestle Canada Inc. and other parties known and unknown, who exchanged confidential pricing information.  The conspiracy was executed through a pattern of communications via email, telephone, private meetings and meetings on the margins of industry association conferences.

b.    The conspiracy reached the highest levels of Defendants' operations.  For example, the President and CEO of Nestle Canada Inc., Bob Leonidas, repeatedly coordinated price increases, discount reductions, and other anticompetitive activities.  These discussions occurred during trade association meetings, at prearranged meeting between the Defendants' officers, and over the telephone. Leonidas sometimes revealed information regarding planned price increases by other competitors including Hershey's.  On a number of occasions, Mr. Leonidas provided the Cooperating Party with lists detailing planned price increases by category prior to the public announcement of those price increases.  Such meetings repeatedly ended with the Cooperating Party having given Mr. Leonidas

14

the impression that it would mirror Nestle's planned price increases. The new President of Nestle Confectionery, Sandra Martinez de Arevalo, went even further and explicitly attempted to convince the Cooperating Party to lead a price increase in 2007. Similar interactions took place at lower levels of Defendants' hierarchies.

c.    The Cooperating Party had pricing discussions with other Defendants besides Nestle Canada. For instance, the VP/GM for Hershey's Canada business, Eric Lent, repeatedly sought meetings with personnel from the Cooperating Party and urged them to follow price increases planned by Nestle. Mr. Lent was introduced to the Cooperating Party by Bert Alfonso, the Chief Financial Officer of The Hershey Company in the United States.

48.    On December 21, 2007—less than one month after the Canadian Competition Bureau announced its investigation—the United States Department of Justice's Antitrust Division ("DOJ") initiated an investigation into Defendants' pricing practices for chocolate confectionery products in the United States. On December 20, 2007, Mars spokeswoman Alice Nathanson said the company has been contacted by the Antitrust Division "regarding their inquiry concerning pricing practices in the U.S. chocolate confectionery industry." Nestle spokeswoman Laurie MacDonald similarly stated that "Nestle USA is aware of a preliminary investigation into the marketing practices in the U.S. chocolate industry." Cadbury spokeswoman Luisa Girotto would neither confirm nor deny whether Cadbury has been contacted by the DOJ, and Hershey spokesman Kirk Saville declined to comment.

49.    Defendants' conspiracy was not limited to their conduct in Canada, but extended as well to their pricing practices in the United States, commencing at least as early as 2002, consistently with the initial timing of collusive activity in Canada. This conclusion is supported initially by the fact that price increases on chocolate confectionery products in both the U.S and Canada from the beginning of 2002 represented a departure from past pricing practices.

50.    The pattern of pricing changes in the United States since 2002 mirrors the pattern in Canada over the same period. Moreover, pricing in the United States prior to 2002 fluctuated

independently of pricing in Canada. This relationship is readily apparent, and is explained by the existence of parallel and interlocking conspiracies to fix prices and restrain trade in the United States and Canada beginning in 2002.

51.    Without a parallel and interlocking scheme including all of Defendants' North American operations, Defendants' North American conspiracy would be undercut by arbitrage from U.S. or Canadian products of the conspirators.

52.    For example, from 1996 to 2002, Defendants made no announcements of wholesale prices increases for chocolate confectionery products. During the period from 1996 to 2002, prices in the United States and Canada for chocolate confectionery products were characterized by stability or price reductions. Beginning in 2002, Canadian authorities have disclosed that defendants began to communicate about price increases and other pricing practices. This conduct was not limited to Canada as defendants announced new prices by the end of 2002 in the United States. From 2002 to 2004, U.S. prices for chocolate confectionery products rose an average of 12.8 percent as a result of the price fixing conspiracy. Following 2004, Defendants successfully maintained U.S. prices approximately 10 percent above 2002 levels.



Chocolate Confectionery Products Unit Prices



Chocolate & Chocolate Confectionery

53.    Canadian authorities have disclosed affidavits seeking search warrants that conclude that there is reasonable cause to believe that a conspiracy to fix the prices of chocolate confectionery products began in February 2002. This conclusion is based on information from an amnesty applicant, the Cadbury defendants, and documents obtained by Canadian competition authorities. In the United States, prior to 2002, prices in Canada were characterized by price reductions and prices in the United States were characterized by price stability. Beginning at the start of 2002 in both the United States and Canada have been characterized by prices increases

54.    The chocolate confectionery product market at issue in this case was ripe for collusion in 2002. In addition to the collective market power exercised by the Defendants, as detailed above, Defendants' profits from these products began to decline in recent years because of increasing health concerns, and changing consumer preferences, with respect to chocolate consumption.

55.    In the face of waning demand, Defendants nonetheless responded by instituting uniform parallel price increases during the Class Period in the U.S. For example, Defendants raised prices in unison in December 2002 (led by Mars), December 2004 (led by Mars), and the beginning of 2007 (led by Nestle).

56.    Pricing for chocolate confectionery products in the United States during the Class Period has thus been characterized by industry-wide price increases. Moreover, during the Class Period, price increases in the same or similar amounts for chocolate confectionery products were announced by multiple Defendants and/or became effective at or near the same time.

57.    For example, following price fixing communications among defendants in Canada in 2005 disclosed by Canadian authorities, defendants announced price increases in Canada effective October 31, 2005. Within a month, Defendants also implemented prices increases in the United States effective for December 2005.

58.    Defendants have falsely asserted that these price changes were fully justified by increases in component costs, in particular the price of cocoa. Changes in the price of raw materials for these products, however, do not explain the announced increases in the prices for these products. The price of raw materials, including cocoa, cocoa butter, sugar, and milk, constitute roughly 10% of the retail price of chocolate confectionery products. Cocoa—the input most cited by Defendants to justify price increases—constitutes somewhere between 3% and 4% of the retail price of chocolate confectionery products. Moreover, following a brief price spike during the civil conflict in the Ivory Coast in 2002, the price of cocoa futures fluctuated within a steady band from mid-2003 through 2007. Rather than being caused by rising costs, the price increases in chocolate confectionery products were the result of collusion among Defendants.

59.    As in Canada, where collusive activities were conducted through trade associations, collusive activities in the United States were orchestrated under the auspices of the Chocolate Manufacturers Association (to which Hershey, Mars and Nestle belonged) and the National Confectioners Association (to which Hershey, Mars, Cadbury Adams USA and Nestle belonged).

60.    Further, the collusive activity in Canada was carried out with the knowledge and active participation of U.S. executives of Hershey and Mars and the parent companies of defendants Cadbury and Nestle in Europe.   For example, Bert Alfonso, who became Senior Vice President, Chief Financial Officer of the Hershey Company in the United States wrote to an executive of Cadbury on January 3, 2007, "In keeping with the good advice from 'The Godfather,' keep close to your competition" and "all kidding aside" offered to introduce the new General Manager of Hershey's Canada business to Cadbury.

61.    In addition, there is substantial import-export trade in chocolate confectionery products between the U.S. and Canada.

62.    Further, the confectionery operations of Defendants in Canada and the U.S. are closely coordinated and chocolate confectionery products are manufactured by Defendants in Canada for export to the United States.   Certain prices increases are also announced for North America as a whole.

63.    Defendants' U.S. and Canadian operations are tightly interwoven. Thus, for example, sales of Hershey's chocolate confectionery products in the U.S. and Canada are overseen by its North American Commercial Group.  Likewise, Cadbury's confectionery sales in the U.S. and Canada are overseen by its Americas Confectionery operating unit. And Nestle has its own Chocolate, Confectionery & Biscuits Strategic Business Unit.

64.     Other important characteristics of the chocolate confectionery products market facilitate anticompetitive collusion among the Defendants.

65.     Chocolate confectionery products are undifferentiated commodity products. Thus, any Defendant can and does produce and sell, for example, a certain type of chocolate candy bar, seasonal novelty chocolate, or boxed chocolate that is fungible with a chocolate candy bar, seasonal novelty chocolate, or boxed chocolate offered by another Defendant.

66.     In addition, there are high barriers to entry to the chocolate confectionery products market in the form of technical know-how, advertising, and access to distribution channels. The manufacture of confectionery products is highly technical, requiring considerable understanding of food technology, including hardware (processing machinery and computers), software and formulation technology. Technical know-how is required to integrate these elements in an effective production system that is efficient and results in a high-quality, innovative product. Moreover, there is significant spending on advertising. In addition, access to supply channels is critical to gain a foothold, as wholesale distributors, chain grocery stores, mass merchandisers, chain drug stores, vending companies, wholesale clubs, convenience stores, dollar stores, concessionaires, and department stores form the most significant distribution channel for confectionery sales. Because of their high collective market share in the U.S., Defendants collectively are able to exercise market power in the U.S. market and are able to raise prices and erect barriers to entry.

67.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise or stabilize prices of chocolate confectionery products.

## FRAUDULENT CONCEALMENT

68.     Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

69.     Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Nor could Plaintiff or the Class members have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

70.     Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning chocolate confectionery products, which they affirmatively concealed, at least in the following respects:

        a.      By meeting secretly to discuss prices, and customers and markets, of
                chocolate confectionery products sold in the U.S. and elsewhere;

        b.      By agreeing among themselves at meetings and in communications not to
                discuss publicly, or otherwise reveal, the nature and substance of the acts
                and communications in furtherance of their illegal scheme; and

        c.      By giving false and pretextual reasons for the prices of chocolate
                confectionery products sold by them during the Class Period and by
                describing such pricing falsely as being the result of competitive factors
                rather than collusion.

71.     Defendants consistently ascribed their price increases to ordinary market forces and considerations, such as increased raw material costs. Plaintiff and Class members did not

have and could not have had, until shortly before commencement of this litigation, access to sufficient information to know that such explanations were false and pretextual.

72.     These false and misleading explanations for price increases lulled Plaintiff into believing that increases were the normal result of competitive market forces rather than the product of collusive efforts.  Defendants' statements about the reasons for the price increases were designed to, and did, put Plaintiff off guard and cause it to accept the increases without undertaking further inquiry.

73.     Plaintiff and Class members did not know, and could not have discovered through reasonable diligence, that Defendants' explanations for these increases in prices for chocolate confectionery products were false and pretextual until shortly before this litigation was commenced.

74.     Because of such fraudulent concealment, and the fact that a price-fixing conspiracy such as this one is inherently self-concealing, Plaintiff and Class members could not have discovered the existence of this conspiracy any earlier than its public disclosure.

75.     As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class' claims have been tolled.

**COUNT I**

**<u>VIOLATIONS OF § 1 OF THE SHERMAN ACT AND § 4 OF THE CLAYTON ACT</u>**

76.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

77.     Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of § 1 of the Sherman Act and § 4 of the Clayton Act.

22

78.    The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and standardized prices for chocolate confectionery products.  Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

79.    Defendants' contract, combination, agreement or conspiracy with the co-conspirators occurred in or affected interstate and international commerce.  Defendants' unlawful conduct was through mutual understanding or agreement between or among Defendants and their co-conspirators.  These other co-conspirators either have acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

80.    Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

a.    Prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Class for chocolate confectionery products were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

b.    Plaintiff and the other members of the Class had to pay more for chocolate confectionery products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

c.    Price competition in the sale of chocolate confectionery products was restrained, suppressed and eliminated in the United States; and

d.    As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys fees;

D.     That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.     That Plaintiff and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: February 5, 2008

Respectfully submitted,

William A. Isaacson
Tanya S. Chutkan
Ian Crichton
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
(202) 237-2727 (*tel.*)
(202) 237-6131 (*fax*)

Courtney R. Rockett (CR2181)
Matthew S. Tripolitsiotis (MT9413)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
(914) 749-8200 (*tel.*)
(914) 749-8300 (*fax*)

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, New York 14701
(716) 664-2967 (*tel.*)
(716) 664-2983 (*fax*)

**Counsel for Plaintiff**